1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5

6   CANDLESTICK HEIGHTS COMMUNITY
    ALLIANCE,                                    Case No.  23-cv-00082-SK

7                Plaintiff,

8           v.                                   **ORDER GRANTING DEFENDANT'S
                                                 MOTION FOR JUDGMENT ON THE
9   CITY AND COUNTY OF SAN                       PLEADINGS AND DENYING
    FRANCISCO,                                   PLAINTIFF'S MOTION TO LEAVE TO
10                                               FILE A SUPPLEMENTAL
                 Defendant.                      COMPLAINT, OR IN THE
11                                               ALTERNATIVE, TO AMEND THE
                                                 COMPLAINT**

12                                               Regarding Docket Nos. 40, 43

13

14          This matter comes before the Court upon consideration of the motion by Defendant City

15   and County of San Francisco ("Defendant") for judgment on the pleadings and the motion by

16   Plaintiff Candlestick Heights Community Alliance ("Plaintiff") for leave to file a supplemental

17   complaint, or, in the alternative, to amend the Complaint.  Having carefully considered the parties'

18   papers, relevant legal authority, and the record in the case, and having had the benefit of oral

19   argument, the Court hereby GRANTS Defendant's motion for judgement on the pleadings and

20   DENIES Plaintiff's motion to file a supplemental complaint or amend the Complaint, for the

21   reasons set forth below.

22                          **REGULATORY BACKGROUND**

23          This is a suit brought pursuant to the Clean Air Act (the "Act" or "CAA").  42 U.S.C. §§

24   7401, 7604.  "The CAA creates a partnership between the federal government and the states to

25   combat air pollution."  *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 502 (9th

26   Cir. 2015).  The United States Environmental Protection Agency ("EPA") promulgates national

27   ambient air quality standards ("NAAQS") for certain air pollutants, and states implement these

28   standards within their borders through a state implementation plan ("SIP").  *Id.*  "Specifically,

United States District Court
Northern District of California

each state must adopt, and submit for the EPA's approval, a SIP that provides for the 'implementation, maintenance, and enforcement' of the NAAQS."  *Id*., quoting 42 U.S.C. § 4710(a)(1).  Once approved by the EPA, "a SIP becomes federal law and must be carried out by the state."  *Id*. at 503.  An approved SIP may be enforced "by either the State, the EPA, or via citizen suits brought under Section 304(a) of the CAA."  *Bayview Hunters Point Cmty. Advocs. v. Metro. Transp. Com'n*, 366 F.3d 692, 695 (9th Cir. 2004).

In California, "local and regional authorities have the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles."  Cal. Health & Safety Code § 40000.  The California Air Resource Board ("CARB") is responsible for coordinating the activities of local air districts to prepare the SIP.  *Id*. at § 39602.  Subject to CARB's oversight, local or regional districts "adopt and enforce" the required SIP for areas under its jurisdiction.  *Id*. at § 40001(a).  The Bay Area Air Quality Management District ("Air District") has jurisdiction in San Francisco.  *Id*. at § 40200.  As relevant here, on June 28, 1999, the EPA approved, for inclusion in the California SIP, Air District Regulation 1, "General Provisions and Definitions," and on May 21, 2018, the EPA approve Air District Regulation 2, "Permits," Rule 1, "General Requirements."  (Dkt. No. 1 ("Compl."), ¶ 35.)

## FACTUAL BACKGROUND

Plaintiff is Candlestick Heights Community Alliance, an all-volunteer unincorporated association committed to making the Candlestick Heights and Bayview Hills neighborhoods within Bayview safe, clean, and well-maintained places to live.  (Compl., ¶¶ 1, 11.)  Bayview is a historically Black community that faces unique economic disadvantages and heavy pollution; according to Plaintiff, Bayview is the focus of some of Defendant's most noxious and unhealthy heavy industries.  (*Id*. at ¶¶ 3, 5.)  Defendant is a municipal corporation.  (*Id*. at ¶¶ 1, 15.)

The key dispute in this case is whether Defendant violated the law by exceeding the threshold horsepower of 50 brake horsepower ("bhp") allowed for by SIP Regulation 2-1-114 when Defendant installed without a permit—in a temporary shelter and service provider for unhoused persons living in vehicles in the Bayview neighborhood—16 light towers powered by diesel-powered generators of 5.1 bhp each.  Plaintiff contends that the generators had an aggregate

1    of 81.6 bhp and thus exceeded the limit of 50 bhp allowed by law.  Defendant argues that there is

2    no requirement of aggregation and thus that each light tower of 5.1 bhp did not exceed the

3    maximum of 50 bhp.

4          Plaintiff advocates for fair and inclusive land use, planning, and protection from industrial

5    and other polluting uses for Bayview communities.  (*Id*. at ¶ 11.)  To that end, Plaintiff brought

6    this citizen suit, under the CAA, 42 U.S.C. § 7604(a)(1), against Defendant.  (*Id*. at ¶ 1.)  Plaintiff

7    alleges that Defendant has failed to comply with the SIP at a site within the Candlestick Point

8    State Recreational Area—namely, a state park in the Bayview Hunters-Point neighborhood,

9    located at 500 Hunters Point Expressway, San Francisco, California.  (*Id*. at ¶¶ 1, 17.)  According

10   to Plaintiff, at that site, Defendant operates a "vehicle triage center" (the "Center"), which is

11   intended as a temporary shelter and service provider for unhoused persons living in vehicles.  (*Id*.

12   at ¶ 1.)  As discussed further below, the crux of this case centers on Defendant's alleged operation

13   of 16 diesel-powered generators at the site in the Center.  (*Id*. at ¶ 20.)

14         Plaintiff alleges that planning for the Center began, at the latest, in April 2021, when

15   Defendant engaged with the California Department of Parks and Recreation to discuss subleasing

16   a 312,000 square-foot portion of the park.  (*Id*. at ¶ 17.)  Noting that it has existing infrastructure,

17   including "water, sewer . . . and electrical poles for lights," Defendant identified the site as

18   "optimal," and Defendant represented that the Center would be a "good neighbor to the

19   Candlestick Point community."  (*Id*. at ¶¶ 2, 17.)  Defendant committed approximately 15 million

20   dollars for site improvements, operation, and other city services for parking and police services

21   associated with the operation of the Center.  (*Id*. at ¶ 17.)  In January 2022, Defendant and the

22   California Department of Parks and Recreation entered into a sublease for the lease period of

23   January 11, 2022, to January 12, 2024.  (*Id*. at ¶ 18.)  And in October 2021, Defendant opened the

24   Center to residents.  (*Id*. at ¶ 18.)

25         When Plaintiff learned of Defendant's plan to operate the Center, its members became

26   concerned because of Defendant's past failures to protect Bayview residents from harmful land

27   use decisions.  (*Id*. at ¶¶ 3, 19.)  For example, there is a wastewater treatment facility in Bayview

28   that processes 80 percent of Defendant's wastewater.  (*Id*. at ¶ 19.)  The Bayview wastewater

treatment facility is outdated and generates diesel pollution, which is highly odorous compared to the facility near the San Francisco Zoo.  (*Id*. at ¶ 19.)  Another example is the industrial center in Bayview on the Port of San Francisco property that has multiple lessees processing concrete material (some without permits), which is known to emit harmful particulate matter.  (*Id*. at ¶ 19.)  In addition, Plaintiff highlights Defendant's plan to implode Candlestick Park Stadium to develop the park into a mini city, without notice to residents.  (*Id*. at ¶ 19.)  Finally, Plaintiff notes the continuing problems the Bayview community has had with Defendant's representations about the status of the extensive radioactive contamination from the former Naval Radiological Defense Laboratory at Hunters Point Naval Shipyards.  (*Id*. at ¶ 19.)  Based on these past failures, Plaintiff monitored developments at the Center in order to protect its members and other residents.  (*Id*. at ¶ 19.)

On a date unknown to Plaintiff, Defendant installed and began operating 16 diesel-powered generators because Defendant was not able to access electricity provided by Pacific Gas & Electric.  (*Id*. at ¶¶ 4, 20.)  Subsequently, on July 22, 2022, Defendant applied to the Air District for permits to operate three large fossil-fuel powered generators to supply "prime power" to the Center.  (*Id*. at ¶ 21.)  Prime power is power to be used for daily needs, not for emergency backup purposes.  (*Id*. at ¶ 21.)  These generators included two diesel-powered generators that have a maximum rated output of 215 bhp and 170.8 bhp, as well as another generator that is run on liquified petroleum gas with a maximum rated output of 230.12 bhp.  (*Id*. at ¶ 21.)  On October 4, 2022, Plaintiff learned from an Air District inspector of the existence and operation of the 16 diesel-powered generators.  (*Id*. at ¶ 22.)  The permit process for the three generators was put on hold until further notice to accommodate public engagement from Bayview residents and has since been re-noticed on December 23, 2022 (which Plaintiff believes indicates the Air District's intent to provide permits to Defendant for operation of the three generators).  (*Id*. at ¶ 21.)  However, that notice did not mention or account for the existence of the 16 generators, or what will happen to them once the three generators are provided final permits.  (*Id*. at ¶¶ 21-22.)

According to Plaintiff, as of October 7, 2022, 49 vehicles were parked at the Center, and upon information and belief, Plaintiff states that "very few" residents have been transitioned to

1  permanent housing from the Center.  (*Id*. at ¶¶ 3, 23.)  Plaintiff asserts that the Center still lacks

2  electricity.  (*Id*. at ¶ 23.)

3  Plaintiff alleges that the Center and Bayview residents, including individuals that are a part

4  of the Candlestick Heights Community Alliance, are exposed to diesel pollution from the 16

5  generators.  (*Id*. at ¶ 24.)  Plaintiff states that the areas directly in the Center's vicinity have among

6  the highest "pollution burdens" in the entire state.[1]  (*Id*. at ¶ 25.)  Two census tracts immediately

7  northwest of the project have pollution burden in the 80th and 90th percentiles.  (*Id*. at ¶ 25.)

8  Plaintiff alleges that the Air District has designated Bayview as an "Overburdened Community of

9  Color" and a "Respiratory Care Zone" because of the high levels of air pollution.  (*Id*. at ¶ 26.)

10  Moreover, Plaintiff states that Defendant has acknowledged that Bayview "has been the focus of

11  some of Defendant's most noxious and unhealthy heavy industries, including steel manufacturing,

12  ship repair, junkyards, and auto wrecking."  (*Id*. at ¶ 26.)  According to Plaintiff, Bayview still

13  hosts the largest percentage of industrial sites, brownfields, leaking underground fuel tanks, and a

14  Superfund site, when compared to the same conditions for residents of the rest of Defendant.  (*Id*.

15  at ¶ 26.)  Plaintiff highlights that 89 percent of people in Bayview are peoples of color, and

16  Bayview is one of few remaining areas in Defendant where Black residents live in a community.

17  (*Id*. at ¶ 27.)

18  Plaintiff alleges that the 16 diesel-powered generators emit diesel pollution into Bayview.

19  (*Id*. at ¶ 28.)  Plaintiff explains that diesel generators emit diesel particulate matter, benzene, and

20  nitrogen oxides, among other dangerous pollutants.  (*Id*. at ¶ 28.)  Plaintiff states that diesel

21  particulate matter is extremely harmful to humans, which the California Air Resource Board and

22  Defendant have recognized.  (*Id*. at ¶¶ 4, 28.)  Plaintiff alleges that Defendant has banned non-

23  emergency use of certain diesel engines with horsepower equal or greater than 50 horsepower for

24  more than 50 hours per year.  (*Id*., citing S.F. Health Code, art. 31, § 2001.)  Plaintiff states that

25  due to Defendant's unlawful conduct, Defendant has exposed the surrounding community to

26  excess amounts of harmful diesel pollution, which is still being released into the neighborhood and

27

28  _____
[1] Plaintiff defines "pollution burden" as the potential exposure to pollutants and the adverse environmental conditions caused by pollution.  (*Id*. at ¶ 25.)

United States District Court
Northern District of California

1    atmosphere.  (*Id*. at ¶ 6.)  In addition, Plaintiff asserts that Defendant violated and continues to

2    violate the Act by failing to disclose the operation of the 16 generators in the application for a new

3    permit for the three generators (*Id*. at ¶ 6.)[2]

4            In November 2022, Plaintiff served on Defendant a Notice of Intent to File Suit ("NOI")

5    pursuant to the Act.  (Dkt. No. 1, Exhibit A.)  And in January 2023, Plaintiff brought this lawsuit,

6    asserting four claims that Defendant had violated the following regulations of the California SIP:

7    regulation 2-1-301 ("authority to construct permit" claim), regulations 2-1-302 and 2-1-401

8    ("permit to operate" claim), regulation 2-1-202 ("complete application" claim), and regulation 1-

9    104 ("circumvention not permitted" claim).  (*Id*. at ¶¶ 42-64.)  Plaintiff seeks injunctive relief, an

10   order requiring Defendant pay civil penalties, and costs of litigation, including attorney's fees.

11   (*Id*. at p. 12.)  Plaintiff alleges that Defendant violated the regulations by operating 16 light tower

12   engines, together which have an output greater than 50 bhp, without first seeking the proper

13   permits.  (*Id*. at ¶¶ 42-52.)  Plaintiff asserts that the horsepower of these engines must be viewed in

14   the aggregate and, as such, the engines do not qualify for an exemption from permitting.  (*Id*. at ¶¶

15   44-45.)

16           In August 2023, the Court directed the parties to coordinate the filing of Plaintiff's motion

17   to supplement the complaint and Defendant's motion for judgment on the pleadings so that the

18   Court could address both in the same hearing.  (Dkt. No. 39.)  The parties complied, the motions

19   were fully briefed, and the Court held a hearing on November 20, 2023.  (Dkt. Nos. 40, 43, 56.)

20   Following the hearing, the Court ordered additional briefing, which the parties provided, on the

21   issue of whether Plaintiff provided sufficient notice to Defendant, as required under the Clean Air

22   Act, in its NOI.  (Dkt. Nos. 60, 61.)

23                                        **ANALYSIS**

24   **A.    Article III Standing.**

25           **1.    Standards for Challenging Standing under Federal Rule of Civil Procedure 12(c)**

26   Defendant brings this motion for judgment on the pleadings under Federal Rule of Civil

27   _____

28           [2] The Court will discuss the supplemental factual allegations Plaintiff wishes to add in its
     complaint in the section on the motion to supplement the complaint.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Procedure 12(c) and argues that Plaintiff lacks Article III standing under each required prong.  A

2    motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)

3    challenges the legal sufficiency of the claims asserted in the complaint.  Certain defenses

4    enumerated in Federal Rule of Civil Procedure 12(b) may be raised through a 12(c) motion,

5    including lack of subject matter jurisdiction, failure to state a claim upon which relief can be

6    granted, and failure to join a party under Rule 19.  Fed. R. Civ. P. 12(h)(2)(B).  When these

7    procedural defects are raised through Rule 12(c), district courts apply the standard of review that

8    otherwise applies to a motion brough under Rules 12(b)(1), (6), or (7), respectively.  *Dworkin v.*

9    *Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

10         A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

11   pleadings (a facial attack) or by presenting extrinsic evidence (a factual attack).  *Warren v. Fox*

12   *Family Worldwide, Inc*., 328 F.3d 1136, 1139 (9th Cir. 2003).  In a factual attack, "a court may

13   look beyond the complaint to matters of public record without having to convert the motion into

14   one for summary judgment."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *see St. Clair v.*

15   *City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("[A] 12(b)(1) motion . . . [can] rely on affidavits

16   or any other evidence properly before the court.").  "When the defendant raises a factual attack,

17   the plaintiff must support her jurisdictional allegations with 'competent proof', under the same

18   evidentiary standard that governs in the summary judgment context."  *Leite v. Crane Co.*, 749

19   F.3d 1117, 1121 (9th Cir. 2014), quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97, 130 S.Ct.

20   1181, 175 L.Ed.2d 1029 (2010).  The plaintiff bears the "burden of proving by a preponderance of

21   the evidence that each of the requirements for subject-matter jurisdiction has been met."  *Leite v.*

22   *Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), citing *Harris v. Rand*, 682 F.3d 846, 851 (9th

23   Cir. 2012).  With one caveat, "if the existence of jurisdiction turns on disputed factual issues, the

24   district court may resolve those factual disputes itself."  *Leite*, 749 F.3d at 1121-22, citing *Safe Air*

25   *for Everyone*, 373 F.3d at 1039-40; *Augustine v. United States*, 704 F.2d 1074, 1077 (9th

26   Cir.1983); *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp*., 594 F.2d 730, 733 (9th Cir. 1979)

27   ("[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed

28   material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional

1    claims.").

2        **2.  Summary of Additional Materials Considered for Standing**

3        In support of their positions, the parties have included declarations, and Defendant has

4    moved for the Court to take judicial notice of certain public records.[3]  The following is a summary

5    of the facts supported by the materials outside the Complaint.

6        On January 11, 2022, Defendant subleased "approximately 312,000 square feet of parking

7    lot" in the Candlestick Point State Recreation Area ("CPSRA"), in San Francisco, from the State

8    of California, for use as the Center.  (Dkt. No. 44 Request for Judicial Notice ("JN"), Exh. A;

9    Compl. ¶ 18.)  The Center serves as a temporary shelter for unhoused persons living in their

10   vehicles, where guests may safely park and "stay in their vehicles while accessing a variety of

11   services and resources to support a permanent exit from homelessness."  (Dkt. No, 44, JN, Exh. B,

12   p. 4; Compl. ¶ 1.)  The San Francisco Board of Supervisors authorized the sublease pursuant to a

13   declared shelter crisis, finding that the subject parking lot was "underutilized" and an "optimal site

14   for [the Center] . . . to resolve the vehicle encampment in the vicinity of the CPSRA," which had

15   grown to an "unsafe level" during the COVID-19 pandemic.  (Dkt. No. 44, JN, Exh. B, pp. 3-4;

16   Compl ¶ 17.)  Defendant also committed to certain onsite improvements, including "install[ing]

17   . . . and "upgrad[ing] electrical service . . . at the Property."  (Dkt. No. 44, JN, Exh. B, p. 5;

18   Compl. ¶ 7.)

19       Defendant's planned site improvements included phased installation of permanent solar

20   lighting because existing lights at the site were in disrepair and had been removed.  (Dkt. No. 43-

21   1, Declaration of Marc Macaraeg ("Macaraeg Decl."), ¶ 4.)  The solar lighting installation would

22

23   ───────────────

        [3] Upon review of Defendant's request for judicial notice, the Court takes judicial notice of
24   all public records.  (Dkt. No. 44, Exhs. A-D, F-G, J.)  The Court also takes judicial notice of the
     attached administrative records but will consider only "the existence of the documents themselves
25   including the findings therein," and "not the contents of the documents for the truth of the matters
     asserted."  *California Sportfishing Prot. All. V. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1038
26   (N.D. Cal. 2017).  (Dkt. No. 44, Exhs. H, I.)  Defendant has also requested that the Court take
     judicial notice of Exhibits E and K, which are sets of correspondence created by the Air District in
27   response to California Public Records Act and Plaintiff's subpoena.  (Dkt. No. 44, Exhs. E, K.)
     Defendant states that it offers Exhibits E and K to demonstrate only that the Air District took
28   certain positions about the SIP and communicated that position through correspondence.  The
     Court takes judicial notice of these documents for only that limited purpose.

United States District Court
Northern District of California

require months of lead time, including time for fabrication of the solar fixtures.  (*Id*.)  Because the Center intended to open for operation on January 21, 2022, Defendant required interim lighting solutions for nighttime illumination relating to the safety and security of the site.  (*Id*.)  Although Defendant considered portable solar lighting options, City engineers determined that these options lacked sufficient power to provide the required nighttime lighting.  (*Id*. at ¶ 5.)  Ultimately, Defendant rented 16 portable light towers for this purpose.  (*Id*.)  Manufacturers' "cut sheets" from Defendant's vendor provide that each of the 16 light towers contained a 5.1 horsepower, Tier 4 Final diesel engine.[4]  (*Id*.)  The light towers were distributed across the Center to ensure adequate lighting throughout the site and egress driveway.  (*Id*. at ¶ 6.)

Many of the diesel generators were placed directly adjacent to the vehicles of the facilities residents—in other words, where residents were living and sleeping.  (Dkt. No. 43-1, Macaraeg Decl., Exh. B; Dkt. No. 48-4, Declaration of Lucas Williams ("Williams Decl."), Exh. D.) Defendant began operating the 16 lights on or around January 18, 2022, and they were used daily between sunset and sunrise until most were replaced by permanent solar fixtures.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 7.)  "On occasions in 2022 and early 2023," Timothy Alan Simon, member of the Candlestick Height Community alliance and local resident, could smell "diesel fumes in the air." (Dkt. No. 49, Declaration of Timothy Alan Simon, ("Simon Decl."), ¶ 4.)

By February 2022, Defendant had placed a purchase order for 17 permanent light poles and solar panels.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 8.)  However, it became clear that electrical service existing at the site proved to be insufficient to accommodate both site operations and the daily needs of guests at the Center.  (*Id*. at ¶ 10.)  Thus, Defendant applied for additional utility service from Pacific Gas & Electric.  (*Id*.)  Faced with ongoing delays in this effort, in July 2022, Defendant applied for a temporary permit from the Air District to operate two diesel electricity generators at the Center while waiting for additional permanent power.[5]  (*Id*.; *see* Compl., ¶ 21.)

---

[4] The EPA has adopted engine tiers for nonroad diesel engines corresponding to the stringency of the emissions reduction, with Tier 0 being the dirtiest, uncontrolled engine and Tier 4 Final being the cleanest standard.  (Dkt. No. 44, JN, Exh. C, pp. 2-3.)
[5] In August 2022, Defendant also applied for a temporary permit to operate one propane (natural gas) generator but withdrew that application on January 4, 2023.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 10 n.1.)

United States District Court
Northern District of California

1    The two generators were registered as Tier 4 Final equipment under CARB's Portable Equipment

2    Registration Program ("PERP").  (Dkt. No. 43-1, Macaraeg Decl., ¶ 10.)

3        In a separate action in state court, on September 20, 2022, Plaintiff filed a motion for

4    preliminary injunction to enjoin Defendant from operating the two PERP generators at the site.

5    (Dkt. No. 17.)  Defendant's permit application with the Air District remains pending, and at no

6    time has Defendant operated these two PERP generators.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 11.)

7        On or about November 1, 2022, Plaintiff mailed its NOI to the San Francisco Department

8    of Homelessness and Supportive Housing.  (Compl., ¶ 8; Dkt. 1, Exh. A.)  The NOI stated that, on

9    October 4, 2022, Plaintiff learned from an Air District inspector that Defendant was operating

10   "sixteen diesel-powered generators" at the Center, each with a maximum rated output of less than

11   50 bhp.  (Dkt. No. 1, Exh. A, ¶ 22; Dkt. No. 44, JN, Exh. J, ¶ 2; Dkt. No. 44, JN, Exh. K.)  The

12   NOI further stated that Defendant violated SIP regulations by installing an operating these

13   "generators" at the Center without a permit.  (Dkt. No. 1, Exh. A, ¶ 22; Dkt. No. 44, JN, Exh. J, ¶

14   2; Dkt. No. 44, JN, Exh. K.)

15       Based on the 16-unit count, Defendant understood the notice to be referencing the 16

16   portable light towers used at the site.  (Dkt. No. 18, ¶ 20; Dkt. No. 43-1, Macaraeg Decl., ¶ 12.)

17   The Air District did not issue a notice of violation for use of the light towers (Dkt. No. 43-1,

18   Macaraeg Decl., ¶ 12), and based on guidance in the Air District Permit Handbook, Defendant

19   staff determined that the light towers, each 5.1 horsepower, were exempt from the Air District's

20   permitting requirements.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 13; Dkt. No. 44, JN, Exh. I.)  City

21   staff further confirmed that the lights were exempt from the Air District permit engineer assigned

22   to Defendant's application for the two PERP engines.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 13.)

23   After the Air District inspector, Simon Winer, took the position that the light towers were exempt

24   from the Air District's permitting requirements, the Air District, through its Director of

25   Engineering, further confirmed the exemption to Plaintiff.  (Dkt. No. 44, JN, Exhibits E, K.)

26       In the separate state court action, on November 23, 2022, Plaintiff's motion for preliminary

27   injunction was denied.  (Dkt. No. 44, JN, Exhibit D.)  By December 22, 2022, eight of the

28   permanent light poles and solar panels were installed and operating at the Center, and Defendant

United States District Court
Northern District of California

discontinued use of nine of the 16 portable diesel light towers at this time.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 8.)  Plaintiff deposed Marc Macaraeg, a Project Manager for San Francisco Public Works, on this issue.  (*See* Dkt. No. 52-1, Declaration of Kathy J. Shin ("Shin Decl."), Exh. G.)  Plaintiff asked Macaraeg when Defendant began removing the light towers, and Macaraeg answered, "sometime in December 2022."  (Dkt. No. 52-1, Shin Decl., Exh. G, 33:10-11.)  When Plaintiff asked "why did Defendant begin removing" the lights at that time, Macaraeg responded, "[w]e finished installing . . . eight of the planned solar light towers—the permanent solar light towers onsite.  And these temporary diesel light towers, not all of them were needed anymore." (*Id*. at 33:12-18.)  When asked why the solar lights were not installed from the start, Macaraeg stated, "[t]he design of those light towers was still being worked out, and they were not permitted by the State Fire Marshal.  But it was always the plan to install the permanent solar lights."  (*Id*. at 34:4-7.)[6]

On January 4, 2023, Macaraeg sent an email to the San Francisco Department of Homelessness and Supportive Housing in which he asked if it could coordinate with a nonprofit organization "to remove 9 of the 16" diesel generated lights.  (Dkt. No. 48-3, Williams Decl., Exh. C, p. 2.)  Later that day, Macaraeg responded to another email, stating that he thought "removing [the lights] by end of next week [January 13, 2023] will be fine."  (*Id*. at p. 1.)

By March 28, 2023, Defendant had installed nine more permanent solar light poles and only one portable diesel light tower remains at the site.  (Dkt. No. 43-1, Macaraeg Decl., ¶ 9.)

While waiting for the temporary permit Defendant applied for in July 2022 from the Air District, Defendant located the two PERP engines onsite to be ready to operate immediately upon issuance of a permit.  (*Id*. at ¶ 14.)  On May 12, 2023, the Air District issued Defendant a Notice to Comply, finding that Defendant's arrangement of the PERP generators constituted a minor

---

[6] Defendant offers, and the Court agrees, that Macaraeg's deposition testimony is consistent with Defendant's discovery responses included in Plaintiff's extrinsic materials.  (*See, e.g.*, Dkt. No. 48-2, Williams Decl., Exh. B, p. 16, lns. 17-19 (stating that the Center was illuminated by seven of the 16 diesel light towers and eight permanent solar fixtures from December 22, 2022, to approximately February 28, 2023), p. 17 ln. 28-p. 18 ln. 8 (answering why temporary Tier 4 Final diesel lights, which operated on ultra-low sulfur diesel, were used at the Center).)

United States District Court
Northern District of California

1    violation of the Air District's rules.  (*Id*. at ¶ 15.)  Defendant promptly moved the generators to an

2    alternative location onsite, disconnected the batteries, and otherwise complied with the direction in

3    the Air District's notice, which the Air District inspector confirmed and notated on May 15, 2023.

4    (*Id*.)

5            Plaintiff has included declarations from three members of the Candlestick Heights

6    Community Alliance.  (*See* Dkt. No. 49, Simon Decl.; Dkt. No. 50, Declaration of Shirley Moore,

7    ("Moore Decl."); Dkt. No. 51, Declaration of Lonnell Howard, ("Howard Decl.").)  Each of these

8    members are also community members who live near the CPSRA and Center.  (Dkt. No. 49,

9    Simon Decl., ¶ 1; Dkt. No. 50, Moore Decl., ¶ 1; Dkt. No. 51, Howard Decl., ¶1.)  These members

10   described the CPSRA, wherein the Center is located, as the only reasonably accessible greenspace,

11   which was "once a jewel."  (Dkt. No. 49, Simon Decl., ¶ 2; Dkt. No. 50, Moore Decl., ¶ 3; Dkt.

12   No. 51, Howard Decl., ¶ 4.)  Each discusses the harms from the fumes of the diesel generators.

13   (*Id*.)

14           **3.  Notice.**

15           At various points in the briefing, adjacent to other arguments, the parties dispute whether

16   Plaintiff's NOI gave Defendant sufficient notice that its claims relate to a hazardous air pollutants

17   violation, as opposed to a simply exceeding the maximum amount of horsepower allowed.  In

18   addition, at the hearing on the motions, Plaintiff advanced, seemingly for the first time, that

19   Defendant's operation of just one of the 16 light tower engines would itself violate the SIP.

20   Further, Plaintiff's proposed supplemental complaint shifts some language to include that the

21   alleged harm caused by Defendant's failure to obtain proper permitting is exposure of additional

22   diesel pollution to Plaintiff's members.  (Dkt. No. 40-1, Exhibit A, ¶ 29.)  Because the threshold

23   issue of sufficient notice fundamentally affects all claims, including the jurisdictional claims, the

24   Court will address it first.

25           "The CAA places much of its enforcement burden on the states . . . .  Thus, a SIP must

26   contain 'enforceable' emissions limitations and assurances that the *state* has sufficient authority

27   and resources to carry out the SIP."  *Nichols*, 784 F.3d at 508 (cleaned up, emphasis in original),

28   quoting 42 U.S.C. § 7410(a)(2)(A).  In particular, SIPs must provide that the "regional agency

United States District Court
Northern District of California

designated by the State . . . will have adequate personnel, funding, and authority . . . to carry out [the] plan."  42 U.S.C. § 7410(a)(2)(E).  "Parties 'may not, through a citizen suit, obtain modification of a SIP to conform with their own notion of proper environmental policy.'"  *Bayview Hunters Point Cmty. Advocs.*, 366 F.3d at 703, quoting *Wilder v. Thomas*, 854 F.2d 605, 614 (2d Cir. 1988).  Citizen suits may only be "'brought to enforce specific measures, strategies, or commitments *designed* to ensure compliance with the NAAQS.'"  *Id.* (emphasis in original), quoting *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1258 (1st Cir. 1996).  In other words, a cause of action does not lie for a violation of NAAQS or a SIP, but one may exist regarding an "emission standard or violation."  *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1173 (9th Cir. 1979); 42 U.S.C. § 7604.  Relatedly, a SIP's "aims and goals . . . are not enforceable apart from the specific measures designed to achieve them."  *Bayview Hunters Point Cmty. Advocs.*, 366 F.3d at 701, quoting *Action for Rational Transit v. West Side Highway*, 699 F.2d 614, 616 (2d Cir. 1983).  It is the "well-established rule that courts may only enforce specific SIP strategies, and may not enforce a SIP's overall objectives or aspirational goals."  *Id.*

In contrast, emissions standards under the CAA "were intended as 'objective evidentiary standards which would have to be met by the citizen who brings an action under the citizen suit provision.'"  *Trounday*, 598 F.2d at 1173 (cleaned up).  The determination of "whether a government instrumentality or other 'person' is a polluter for purposes of [the citizen suit provision] was to be made against these objective standards."  *Id.* (discussing legislative history).  Thus, "SIP rules that involve purely subjective standards do not qualify [for enforcement via citizen suit], while those that announce concrete, objective permitting requirements do."  *Coalition for Clean Air v. VWR Intern., LLC*, 922 F. Supp. 2d 1089, 1102 (E.D. Cal. 2013) (internal quotations omitted); *see* Revisions to the California State Implementation Plan, San Joaquin Valley Unified Air Pollution Control District, 76 F.R. 26609-01, 2011 WL 1740512, at *26612 (May 9, 2011) ("SIPs contain many aspects which are not federally enforceable emissions limitations.").

Regarding notice, under the CAA, "[n]o action may be commenced under subsection (a)(1) prior to 60 days after the plaintiff has given notice of the violation (i) to the [EPA], (ii) to the State

13

in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order

. . . ."  42 U.S.C. § 7604 (b)(1)(A).  "[C]ompliance with the 60-day notice provision is a

mandatory, not optional, condition precedent for suit."  *Ctr. for Biological Diversity v. Marina*

*Point Dev. Co*., 566 F.3d 794, 800 (9th Cir. 2009), quoting *Hallstrom v. Tillamook Cnty*., 493 U.S.

20, 26 (1989).  The EPA has adopted the following requirements for sufficient notice in CAA

citizen lawsuits:

> Notices to the Administrator, States, and alleged violators regarding
> violation of an emission standard or limitation or an order issued with
> respect to an emission standard or limitation, shall include sufficient
> information to permit the recipient to identify the specific standard,
> limitation, or order which has allegedly been violated, the activity
> alleged to be in violation, the person or persons responsible for the
> alleged violation, the location of the alleged violation, the date or
> dates of such violation, and the full name and address of the person
> giving the notice.

(40 C.F.R. § 54.3(b).)  In applying these requirements, the Ninth Circuit has stated that courts are

to assess "whether, '[i]n practical terms, the notice [was] sufficiently specific to inform the alleged

violator about what it [was] doing wrong, so that it [knew] what corrective actions [would] avert a

lawsuit.'"  *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002), quoting

*Nat. Res. Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000).

"Although the notice must be sufficiently adequate so that the recipients can identify the basis for

the complaint, the citizen is not required to list every specific aspect or detail of every alleged

violation."  *Community Ass'n for Restoration of the Environ. V. Henry Bosma Dairy*, 305 F.3d

943, 951 (9th Cir. 2002) (internal quotation omitted).

Upon review of the NOI, the Court finds that Plaintiff has provided sufficient notice as to

the activity alleged to be in violation (running the 16 light tower diesel engines), the person

responsible (Defendant), the location (the Center in the CPSRA), the alleged dates of such

violation (between January and October 2022), and the full names of persons giving notice.  (Dkt.

No. 1, Exhibit A.)  However, regarding the sufficient information to identify the specific standard,

limitation, or order which has allegedly been violated, the Court finds that NOI put Defendant on

notice of only a possible violation of excess brake horsepower—not a violation based on

hazardous air pollutants.

Turning first to the section of the NOI that is labeled "Violations of Emissions Standards or Limitations," in this section, Plaintiff describes that the CAA allows for citizen suit on only violations of "emissions standards or limitations." According to Plaintiff, this term of art is broadly defined to include an emission limitation; emission standard; and any other standard or limitation established under "any applicable State implementation plan approved by the [EPA]," including any requirement to obtain a permit as a condition of operations. 42 U.S.C. § 7604(f)(4). Plaintiff then asserted that all of SIP Regulations 1 and 2 represent an emission standard or limitation within the meaning of the Act.

Next, in the sections in the NOI regarding Defendant's alleged violations of failing to receive an authority to contract and operating without a permit (Dkt. No. 1, Exhibit A, NOI, 4-5), Plaintiff begins by outlining the definitions of "source" and "facility" in SIP Regulation 2 and then asserts that the 16 light towers were such a "source" because, in part, they are machines that may emit "diesel PM and ozone precursors such as nitrogen oxides." (*Id*. at 4.) Plaintiff then states, "[t]ogether, the sixteen generators have a maximum output rating greater than 50 bhp. They do not qualify for any exemptions from permitting, including from SIP Regulation 2-1-114.2 . . ." (*Id*.) Plaintiff then notes that Defendant qualifies as a "person" under the SIP regulations and that Defendant has violated this regulation every day since the generators were first installed. (*Id*.)

The Court finds that, in the NOI, Plaintiff put Defendant on notice that the 16 light tower diesel engines, together, have a maximum output greater than 50 bhp and do not qualify for an exemption, allegedly in violation of the SIP. While Plaintiff states in the NOI that the light towers may be emitting diesel particulate matter and ozone precursors such as nitrogen oxides, the Court finds that Plaintiff did not put Defendant on notice of any emissions standard or limitation that has been allegedly violated relating to hazardous air pollutants—much less that Defendant's operation of one light tower by itself violated the SIP. This is only underscored by how Plaintiff pleaded its claims in the Complaint. (*See* Dkt. No. 1.) Accordingly, the Court concludes that Plaintiff may rely only on its theory that Defendant violated the SIP because it exceeded the maximum horsepower allowed by law.

**4. Standards for Standing**

United States District Court
Northern District of California

The standing doctrine "is an essential and unchanging part of the case-or-controversy requirement of Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  It requires plaintiffs to "'allege[] such a personal stake in the outcome of the controversy' as to warrant [their] invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).  "An association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  The "irreducible constitutional minimum" of standing requires the association to show that at least one member has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) ("[T]he relevant inquiry is whether at least one member from each group has established standing to sue in his or her right.").

A plaintiff must demonstrate standing for each claim they seek to press and "for each form of relief sought." *DaimlerChrysler Corp.*, 547 U.S. at 352.  "'[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'" *Summers*, 555 U.S. at 493, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### a.   Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339, quoting *Lujan*, 504 U.S. at 560.  For an injury to be "concrete," it must be "'real' and not 'abstract.'" *Id*. at 340, quoting Webster's Third New International Dictionary 472 (1971).  In order to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560, n.1.  That said, "intangible

injuries can . . . be concrete." *Spokeo*, 578 U.S. at 340.

Article III standing "requires a concrete injury even in the context of a statutory violation." *Id*. at 341.  In other words, "a bare procedural violation, divorced from any concrete harm" cannot "satisfy the injury-in-fact requirement of Article III." *Id*.  Moreover, "general averments" and "conclusory allegations" are likewise inadequate. *Laidlaw*, 528 U.S. at 184.  In the environmental context, for Article III purposes, a plaintiff must assert "a 'concrete' interest . . . is threatened by the proposed action." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  A "free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." *Whitewater Draw Natural Res. Conserv. Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021).

As the Ninth Circuit has explained, the "analysis of Article III standing is 'not fundamentally changed' by the fact that a petitioner asserts a 'procedural,' rather than a 'substantive' injury." *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Com'n*, 457 F.3d 941, 949 (9th Cir. 2006), quoting *City of Sausalito*, 386 F.3d at 1197.  Ultimately, plaintiffs asserting a procedural claim must "establish the reasonable probability of the challenged action's threat to [their] concrete interest." *Whitewater Draw*, 5 F.4th at 1013.  "'[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the *challenged* activity.'" *Covington v. Jefferson Cnty.*, 358 F.3d 626, 639 (9th Cir. 2004) (emphasis in original), quoting *Laidlaw*, 528 U.S. at 183.

Defendant argues that Plaintiff has failed to allege an injury in fact because the Complaint did not allege a concrete or particularized injury to any individual member of Plaintiff's organization.  (Dkt. No. 43, Defendant's Motion for Judgement on the Pleadings ("Mot."), 10-11.) Defendant also argues that Plaintiff failed to allege that any level of diesel emissions is harmful. (*Id*. at 11.)  Plaintiff responds that it has alleged that its members have suffered an actual and imminent injury by their exposure to Defendant's operation of the light towers, powered by the diesel generators.  (Opp., 8.)  Plaintiff begins by arguing that exposure to hazardous air pollutants is a concrete injury, recognized by the Ninth Circuit.  (Dkt. No. 47, Plaintiff's Opposition to

17

Defendant's Motion for Judgement on the Pleadings ("Opp."), 8.)  Plaintiff then directs the Court to the declarations it submitted to show their harm.  Defendant responds with a nuanced argument that the allegations in the Complaint and the testimony provided by Plaintiff's declarants fail to demonstrate how Plaintiff's members were actually harmed by the challenged conduct: Defendant "operating a large number of diesel generators [at the Center] without applying for an air quality permit." (Mot., 4.)  Defendant is correct.

In its Complaint, Plaintiff contends that its members "are exposed to diesel pollution from the sixteen light pole generators," which together exceeded the threshold for a permit, 50 bhp, under the California SIP.  (Compl., ¶ 24, 43.)  As Defendant notes, by December 22, 2022, only seven of the 16 light towers (each 5.1 horsepower, for a total of 35.7 horsepower) were in use at the Center, and as of March 28, 2023, only one light tower remains onsite.  (Dkt. No. 43-1, ¶¶ 8, 9.)

In the declarations offered by Plaintiff, as noted above, three of Plaintiff's members attribute various harms from diesel pollution to Defendant's operation of the Center.  Declarant Timothy Simon stated that he "can see the facility from [his] balcony." (Dkt. No. 49, Simon Decl., ¶ 4.)  Before the Center opened, Simon would use the park up to three times a week, but "because of the [Center's] use of diesel generators and other impacts," Simon does not use the park as much as he used to.  (*Id*.)  Simon stated that he visits "much less often because [he] is concerned about the hazardous air pollution from the facility's diesel generators." (*Id*.)  In addition, "because of the facility's use of diesel generators and other impact," another declarant stated that, "I no longer enjoy using the park as much as I used to." (Dkt. No. 49, Simon Decl., ¶ 4.)

Declarant Shirley Moore used to visit the state park "every day for 30 years." (Dkt. No. 50, Moore Decl., ¶ 3.)  However, since the Center opened, Moore claimed that she is "prevented from enjoying the state park." (*Id*. at ¶ 4.)  Moore stated that she visits the park "less often than [she] used to due to the hazardous air pollution from the [Center's] diesel generators." (*Id*.)  While she still walks her dogs every day, Moore does so only when the generators are not in operation.  (*Id*.)  Moore stated that she has seen a decrease in the population utilizing the park.

1   (*Id.*)  She also states: "I can smell diesel fumes from the generators at my home [a quarter mile

2   away from the Center].  I cannot open my windows . . . because of the fumes and soot emitted

3   from Defendant's diesel generators at the facility."  (Dkt. No. 50, Moore Decl., ¶ 2.)

4   Declarant Lonnell Howard is a longtime resident of the Alice Griffith apartments, which is

5   located about 1,500 feet away from the Center.  (Dkt. No. 51, Howard Decl., ¶ 2.)  Howard can

6   see the Center from his apartment and stated that "[he] can smell the fumes and [has] seen soot on

7   the windows of Alice Griffith apartments," which Howard attributes to the diesel generators.  (*Id.*)

8   Howard does not open his windows or doors to avoid the diesel emission from the generators at

9   the Center.  (*Id.* at ¶ 3.)  Howard states that he no longer uses the state park for exercise or

10   recreation.  (*Id.* at ¶ 4.)  Howards has observed less families and children utilizing the state park.

11   (*Id.*)  He also states:  "I am fearful of using the greenspace near the facility because I am

12   concerned that doing so would further expose me to diesel emissions."  (Dkt. No. 51, Howard

13   Decl., ¶ 4.)

14   Significantly, these declarations lack any specified timeframe for the alleged injuries or

15   address any attenuation of the harms by Defendant's installation of the solar alternatives.  Only

16   one declaration mentions a timeframe and indicates that the reduction of the aggregated

17   horsepower of lights at the Center below the 50 bhp minimum threshold did not affect injuries:

18   "[o]n occasion in 2022 and early 2023 when I visited the area in the park near the [Center], I could

19   smell diesel fumes in the air."  (Dkt. No. 49, Simon Decl., ¶ 4)  From these declarations, the Court

20   finds that Plaintiff has failed to demonstrate that its members were harmed by the challenged

21   conduct because it appears Plaintiff's members smelled the fumes regardless of whether

22   Defendant operated 16 light towers, seven, or one.  In other words, Plaintiff has failed to

23   "establish the reasonable probability of the challenged action's threat to [their] concrete interest."

24   *Whitewater Draw*, 5 F.4th at 1013.

25   The parties dispute the import of two cases, *Hall v. Norton* and *Nuclear Info. & Res. Serv.*

26   *v. Nuclear Reg. Com'n*.  Beginning with *Hall*, in that case the plaintiff brought an action alleging

27   that the Bureau of Land Management violated, as relevant here, the National Environmental

28   Policy by approving an exchange of public land.  266 F.3d at 971-72.  The plaintiff alleged that

United States District Court
Northern District of California

the exchange created significant emissions of particulate matter, leading him to develop a lung sensitivity manifesting in a persistent cough. *Id.* at 973. The district court granted summary judgment in favor of the defendant because it found that the plaintiff lacked standing. *Id.* at 972. The Ninth Circuit reversed. *Id.* at 977. Regarding injury in fact, the Court noted that the plaintiff had averred "that his respiratory discomfort [would] be aggravated by emissions from developments on former BLM lands." *Id.* at 976. The Court then observed "that evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." *Id.* Thus, the plaintiff had demonstrated that "the regulation [would] lead to increased exposure to pollutants and an adverse effect on health." *Nuclear Info. & Res. Serv.*, 457 F.3d at 953, discussing *Hall*.

In *Nuclear Info. & Res. Serv.*, the plaintiffs challenged the Nuclear Regulatory Commission's revision to regulations concerning the transportation of radioactive material for failure to comply with the procedural requirements of the National Environmental Policy Act. 457 F.3d at 944. The district court dismissed the action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, pursuant to 49 U.S.C. § 20114(c). *Id.* On appeal, the Ninth Circuit dismissed the plaintiffs' petition because of lack of standing. *Id.* at 955. The Court noted that "[n]one of declarations submitted by members of [the plaintiffs] . . . explain in any way how their health may be affected by this regulation." *Id.* at 953. Moreover, none of the declarants "alleged with any specificity what geographic areas are most likely to be affected, other than to assert that the regulations impact highways nationwide. Nor have they alleged that they will be exposed to increases in radiation or that they will curtail their use of public highways" because of the regulation. *Id.* The Court was careful to observe that the plaintiffs had "fail[ed] to show that its members' concrete interest [was] threatened by the *challenged regulation*, rather than by 'unregulated transportation of radioactive material' in the abstract." *Id.* at 954 (emphasis in original). The Ninth Circuit concluded that "[t]he declarations simply express[ed] undifferentiated 'concerns'—the same concerns . . . shared by the public at large—and speculate[d] that unregulated transportation of radioactive material in general—not this regulation in particular— may present unspecified threats to their health." *Id.* Thus, the plaintiffs failed to allege an injury

1    in fact.  *Id*.

2          The Court observes that neither of these cases is dispositive as to whether Plaintiff here has

3    established an injury in fact.  Rather, both *Hall* and *Nuclear Info. & Res. Serv*. are examples of

4    how the Ninth Circuit has applied its analysis of "injury in fact" to environmental cases.

5    Ultimately, the Court concludes that these cases support the determination that Plaintiff has failed

6    to establish an injury in fact.  Unlike the plaintiff in *Hall*, Plaintiff here has failed to connect the

7    operation of the sixteen light towers without applying for a permit (the challenged regulation) to

8    the exposure to hazardous air emissions.  And while not an exact parallel, the Court notes that this

9    case is closer to *Nuclear Info. & Res. Sev.* because the declarations do not show how Plaintiff's

10   members' concrete interests are threatened by the challenged regulation, rather than by hazardous

11   air emissions in the abstract.

12         In addition, the Court concludes that Plaintiff has failed to establish an injury in fact for

13   purposes of injunctive relief.  The challenged conduct in the Complaint is Defendant's alleged

14   operation without a permit of 16 light towers with an aggregate of 50 bhp or greater.  (Compl., ¶

15   24, 43.)  As noted above, Plaintiff shifted its legal theory of injury from horsepower to general

16   exposure to hazardous air emissions.  (Opp., 10-11.)  However, undifferentiated "exposures" and

17   "concerns" are insufficient for Article III standing, and conclusory claims to injury do not

18   establish an actual injury, by the alleged misconduct, "occurring at the time the complaint was

19   filed." *Laidlaw*, 528 F.3d at 422.  In an effort to demonstrate an actual an imminent harm,

20   Plaintiff seemingly conflates Defendant's installation of the two PERP engines with Defendant's

21   operation of the 16 light towers.  As Defendant explains, Defendant's operation of the 16 light

22   towers without a permit (allegedly in violation of the SIP) is distinct from Defendant's permit

23   application and installation, but not operation, of the separate PERP engines.  Moreover, Plaintiff

24   does not explain how the application for the PERP engines had any effect on Defendant's

25   operation of the 16 light towers.  Therefore, the Court concludes that Plaintiff has failed to show

26   "a sufficient likelihood [of being] wronged in a similar way" or an imminent injury sufficient for

27   injunctive relief.  *Davidson v. Kimberly-Clark Corp*., 889 F.3d 956, 967 (9th Cir. 2018).

28               **b.  Traceability**

United States District Court
Northern District of California

21

1    Traceability requires a plaintiff to articulate "a causal connection between the injury and

2    the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the

3    defendant, and not the result of the independent action of some third party not before the court.'"

4    *Lujan*, 504 U.S. at 560-61 (cleaned up), quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426

5    U.S. 26, 41-42 (1976). "The line of causation between the defendant's action and the plaintiff's

6    harm must be more than attenuated." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849,

7    867 (9th Cir.2012) (citations and quotes omitted). A "causal chain does not fail simply because it

8    has several links, provided those links are not hypothetical or tenuous and remain plausible."

9    "Nor does standing require the defendant's action to be the sole source of injury." *Bellon*, 732

10   F.3d at 1142. Notwithstanding, "conclusory, generalized statements of 'contribution'" will not

11   suffice. *Id.* at 1142.

12   Defendant argues that Plaintiff cannot trace the harm of diesel emissions to Defendant's

13   operation of the Center. (Mot., 13-15.) Defendant also asserts that any causal chain for non-

14   permitting injuries is too attenuated to support standing. (*Id.*) Plaintiff responds that it is enough

15   that it has alleged that Defendant's operation of the Center caused the injuries of Plaintiff's

16   members. (Opp., 11.) Defendant is correct.

17   The Court finds that Plaintiff has not sufficiently alleged any specific, localized injuries in

18   the pleadings. Specifically, in the Complaint, Plaintiff does not link the claims of harm from

19   diesel emissions ("Diesel PM is extremely harmful to humans") to Defendant's operation of the

20   light towers at the Center. (Compl., ¶ 28.) While Plaintiff has alleged exposure ("[Plaintiff's]

21   members, are exposed to diesel pollution from the sixteen generators"), the claim is vague and

22   conclusory. (Compl., ¶ 24.) Moreover, it is undercut by Plaintiff's apparent concession that any

23   aggregation of horsepower below 50 bhp is not unlawful. (Compl., ¶¶ 43, 45.) Finally, Plaintiff

24   includes in its Complaint and declarations that there are various other sources of pollution in the

25   Bayview area, the location of the Center. (Compl., ¶¶ 1, 26, 28.)

26   Despite Plaintiff's assertion otherwise, *Bellon* offers some support the Court's conclusion.

27   In *Bellon*, on appeal, the defendants argued, for the first time, that the plaintiffs lacked standing.

28   732 F.3d at 1138. The Ninth Circuit assumed without deciding that the plaintiffs had established

United States District Court
Northern District of California

an injury in fact related to greenhouse gas emissions and climate change. *Id*. at 1140-41.

However, the Court concluded that the plaintiffs were not able to show "a causal connection

exist[ed] between their asserted injuries and the conduct complained of—*i.e*., the Agencies' failure

to set and apply [reasonably available control technology] standards [for greenhouse gases]." *Id*.

at 1142.  The "[p]laintiffs' causal chain . . . consist[ed] of a series of links strung together by

conclusory, generalized statements of 'contribution,' without any plausible scientific or other

evidentiary basis that the refineries' emissions [were] the source of their injuries." *Id*.  The Court

noted that "attempting to establish a causal nexus . . . may be a particularly challenging task"

where "there is a natural disjunction between Plaintiffs' localized injuries and the greenhouse

effect." *Id*. at 1143.  Moreover, the Court noted that there are "numerous independent sources" of

greenhouse gas emissions in and outside of the United States, making "the causal chain . . . too

tenuous to support standing." *Id*. at 1143-44.  Thus, the Ninth Circuit vacated the district court's

order and remanded with instructions to dismiss for lack of subject matter jurisdiction. *Id*. at

1147.  While the causal connection in *Bellon* was even more tenuous than is the case here,

Plaintiff has still failed to sufficiently connect that Defendant's operation of the light towers to the

harm claimed by Plaintiff's members.[7]

### c.  Redressability

To establish Article III redressability, a plaintiff "must show that the relief they seek is

both (1) substantially likely to redress their injuries; and (2) within the district court's power to

award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).  The Supreme Court has

clarified that the "fairly traceable" and "redressability" components for standing overlap and are

"two facets of a single causation requirement."  *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)

(citation and quotes omitted).  "The two are distinct insofar as causality examines the connection

---

[7] Defendant also argues that, because Defendant relied on the Air District's determination that the light tower engines were exempt, Plaintiff's causal chain is broken by the Air District's actions.  On this point, the Court disagrees.  Simply because multiple parties believed they were not in violation of an emissions standard or violation does not necessarily mean that standard was not violated and that those parties would not be subject to a citizen lawsuit. *Bellon*, 732 F.3d at 1142 (A "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.").

between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief." *Bellon*, 732 F.3d at 1146, citing *Allen*, 468 U.S. at 753 n.19. Redressability does not require certainty, "but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Id.*, citing *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir.2010).

Plaintiff argues that it has sufficiently alleged injuries that are redressable either by an order imposing civil penalties or an order enjoining Defendant from operating the subject light towers without a permit. (Opp., 12.) Plaintiff also states that requiring Defendant to apply for a permit would allow for Plaintiff's right to participate in the review process. (*Id.* at 15.) Defendant responds first by arguing that, by the time Plaintiff filed its lawsuit, the Center had discontinued the use of nine of the light tower generators, reducing the horsepower of the remaining seven engines, even in the aggregate, to below 50 bhp. (Mot., 16.) Regarding Plaintiff's asserted right to participate in the permit process, Defendant argues that this relief would depend on the actions within the discretion of the Air District, a non-party, and thus beyond the reach of this Court. (Mot., 17.) Defendant's position prevails here.

Despite Plaintiff's suggestion otherwise, the Court finds that the record for judgment on the pleadings establishes that City ceased using nine of the 16 light towers by December 2022, before the Complaint was filed. (Dkt. No. 43-1, Macaraeg Decl., ¶ 8; Dkt No. 48-3, pp. 2-3; Dkt. 52-1, Exhibit G, Deposition of Mark Macaraeg, 33:9-18, 34:4-7.) Plaintiff filed its Complaint on January 6, 2023. (Dtk. No. 1.) Therefore, even if the regulations required aggregation of the horsepower of the remaining seven light towers, the result was below the 50 bhp threshold by the time of Plaintiff filed suit. Therefore, the Court concludes that any alleged violation by Defendant by exceeding the maximum amount of horsepower had abated by the time Plaintiff filed its lawsuit. As the Supreme Court of the United States has observed, "private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations." *Laidlaw*, 528 U.S. at 188, discussing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-07 (1998). Therefore, civil penalties cannot redress Plaintiff's alleged harm in this case.

For largely the same reasons, the Court finds that or an order enjoining Defendant from

operating the subject light towers without a permit cannot redress Plaintiff's alleged harm. While Plaintiff raises the prospect that requiring Defendant to seek a permit would "allow for the [Plaintiff's] and the general public's right to participate in the review process," since the violation abated, a court order of enjoinment would be academic at best. Further, because the permitting process involves the broad discretion of the Air District, which is not a party to this action, a court order would not adequately address redressability under Article III standing. *Whitewater Draw*, 5 F.4th at 1016 ("There is no redressability, and thus no standing, where . . . prospective benefits depend on an actor who retains broad and legitimate discretion the courts cannot . . . control.").

In sum, the Court finds that Plaintiff has failed to establish any of the indispensable Article III elements of standing—injury in fact, traceability, and redressability. Therefore, the Court DISMISSES this case for lack of standing.

**B.      Plaintiff's Motion to Supplement the Complaint.**

Parties may supplement pleadings based on events "that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Supplemental pleadings may be filed only with leave of the court. *Id*. Although leave to file is favored to promote judicial efficiency, "it cannot be used to introduce a separate, distinct and new cause of action." *Planned Parenthood of Southern Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997) (internal quotation omitted). "The legal standard for granting or denying a motion to supplement under Rule 15(d) is the same as for amending one under 15(a)." *Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 214 (N.D. Cal. 2015) (internal quotation omitted). "[I]f amendment would be futile," a motion for leave to file a supplemental pleading is "properly denied." *Carrico v. City and Cnty. of San Francisco*, 656 F.3d 1002, 1007 (9th Cir. 2011). "Futility alone can justify the denial of a motion to amend." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (internal quotation omitted); *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc*. 744 F.3d 595, 600 (9th Cir. 2014), quoting *Carrico*, 656 F.3d at 1008.

The principal additions to the proposed supplemental complaint (Dkt. No. 40-1, Exhibit A) are more allegations clarifying Defendant's installation of the two PERP engines and the ensuing notice to comply issued by the Air District. (*Id*. at ¶¶ 4, 27-28, 51-52, 69-70.) Plaintiff begins by

United States District Court
Northern District of California

1     asserting that Defendant installed and/or operated the PERP engines without seeking proper

2     permits. (*Id.* at ¶ 4.) Plaintiff then notes that the Air District issued a notice to comply on May 12,

3     2023, instructing Defendant to disconnect the engines by May 15, 2023. (*Id.* at ¶¶ 27-28.) This,

4     in Plaintiff's view, was a separate incident that supports its current claims in the Complaint. (*Id.*

5     at ¶ 51.) Specifically, Plaintiff includes allegations about Defendant's alleged installation or

6     operation of the PERP engines in the claims for authority to construct permit and circumvention

7     not permitted. (*Id.* at ¶¶ 51, 69-70.) As mentioned previously, Plaintiff also seeks to broaden its

8     theory of harm to include the exposure of Plaintiff's members to additional diesel pollution as well

9     as depriving Plaintiff's members of the right to participate in the public permitting process. (*Id.* at

10    ¶ 29.) Finally, Plaintiff has included some housekeeping allegations, including further procedural

11    background to the NOI. (*Id.* at ¶¶ 10-11.)

12            Significantly, nothing in the proposed supplemental complaint appears to cure Plaintiff's

13    lack of Article III standing. Beginning with injury in fact, the supplemental allegations do not

14    supply any additional information on a specific timeframe regarding Plaintiff's alleged injuries. In

15    addition, the supplemental allegations do not further describe the type and severity of the alleged

16    injuries caused by hazardous air pollution and do not allege that there is an active actual and

17    imminent harm. Turning to traceability, Plaintiff's supplemental allegations do not create

18    standing because Plaintiff still has not connected the claims of harm from diesel emissions to

19    Defendant's operation of the Center. Nor has Plaintiff addressed that there are various other

20    sources of pollution in the Bayview area. Finally, the supplemental allegations do not remedy

21    Plaintiff's redressability deficiency. The supplemental allegations do not address the issue that

22    any alleged violation by Defendant by exceeding the maximum amount of horsepower had abated

23    by the time Plaintiff filed its lawsuit or that the Air District is not a party to this action and

24    maintains its own broad discretion in the permitting process. Therefore, the Court concludes that

25    granting the motion to supplement the complaint would be futile because none of the supplemental

26    allegations would cure Plaintiff's lack of standing. Thus, the Court DENIES Plaintiff's motion to

27    supplement the Complaint.

28            In a final attempt to save the case, Plaintiff, in its opposition, asks the Court for leave to

amend the complaint. Plaintiff simply asserts that it "can cure any perceived deficiencies in the complaint by amendment." (Opp., 24.) Federal Rule of Civil Procedure 15(a)(2) commands that courts should "freely give leave when justice so requires." However, in determining "the propriety of a motion for leave to amend," courts can consider several factors. *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973). These criteria include "undue delay, bad faith, futility of amendment, and prejudice to the opposing party." *Id.* "Not all of the factors merit equal weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Prejudice is the "touchstone of the inquiry under rule 15(a)." *Id.*

Beginning with prejudice, the Court notes that fact discovery closed on September 22, 2023, and expert discovery closed on November 24, 2023. Trial has been scheduled for May 7, 2024. Thus, if Plaintiff were allowed to amend the Complaint this late in the litigation, Defendant would not be able to conduct further discovery on any new allegations unless the Court were to re-open discovery. Even if the Court were to re-open discovery, Defendant would be then required to expend a significant amount of time and resources to address the new allegations. Either avenue is prejudicial to Defendant. Therefore, the Court finds that allowing leave to amend would prejudice Defendant.

Turning to futility of amendment, the Court notes that Plaintiff cannot now amend its Complaint to allege that the diesel engines violated the SIP by violating regulations regarding hazardous air pollution because Plaintiff failed to put Defendant on notice in the NOI of that theory. As discussed above, the NOI is limited to the theory that Defendant violated the law by allowing diesel engines with aggregated horsepower in excess of the maximum allowed. Thus, an amendment based on this new theory would be futile because Plaintiff failed to provide adequate notice. In addition, with the benefit of the judgment on the pleadings record, it does not appear that Plaintiff could amend its complaint to allege that there is active actual and imminent harm because any alleged violation by Defendant by exceeding the maximum amount of horsepower had abated by the time Plaintiff filed its lawsuit. Thus, the Court finds that leave to amend would be futile.

Accordingly, because the Court finds that leave to amend would prejudice Defendant and

would be futile, the Court denies Plaintiff's request in its opposition for leave to amend.

*Coronavirus Reporter v. Apple, Inc.,* 85 F.4th 948, 958 (9th Cir. 2023).

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant City and County of San Francisco's motion for judgment on the pleadings (Dkt. No. 40) and DENIES Plaintiff Candlestick Heights Community Alliance's motion to file a supplemental complaint as futile.  (Dkt. No. 43.) The Court DISMISSES this matter WITH PREJUDICE.

**IT IS SO ORDERED**.

Dated: December 21, 2023

_____

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California

28